Panel will next hear Roe v. FCA U.S. Case No. 21-6073. Counsel, you may proceed. Good morning. Nate Lees, the court. The mechanics of the product defect at issue in this case are complicated, but the legal issues are not. We're here because the district court exceeded the bounds of permissible choice in evaluating our experts' qualifications and whether their testimony was reliable. Could I just ask you, right off the bat, do you contend that the district court applied the wrong legal standard on any of its expert evidence rulings, or is your argument that the district court did not properly apply Rule 702? I think our argument is primarily that it was improperly applying Rule 702, but I think there is a way to view the way that the court applied Rule 702. I'm sorry, I'm not sure if I said that correctly, but I think the de novo standard is a way to look at the issues in this case, particularly with regard to the analytical gap. I think there's case law in this circuit saying that testing is not required in order to satisfy Rule 702, and I think that would be a legal error that might require de novo review. But I think it's certainly more common to review it under the abuse of discretion standard, and I think that standard is met here. Well, you may keep that in mind as you work through your argument. Yes, certainly. I hate to still keep you before getting into your prepared remarks, but just as a matter of housekeeping, you have two issues that I'm really not sure if they are anything other than academic for purposes of the disposition. The first is the qualifications of Mr. Meyer. Now, obviously, if you were to have a trial and the district court, as Judge Polk did, excluded Mr. Meyer from testifying that there was a design defect, would be important. You would want to present that testimony, but Judge Polk obviously granted summary judgment to the defendant, but not on the basis that there was not evidence of a design defect because he credited the report of Mr. Sullivan. So for purposes of the summary judgment ruling, unless we find some other basis to overturn the summary judgment ruling, isn't the exclusion of Mr. Meyer's testimony on the existence of a design defect academic? Well, yes, I do agree that that alone would not change the outcome of this case one way or the other, but I don't know that I necessarily agree that it's purely academic because I think it is important that the district court get it right when they're evaluating. Well, I understand that, but it would not bear on summary judgment. Yes, I agree. And the second related question is the exclusion of the testimony by Mr. Sullivan or Mr. Meyer on the feasibility of an out-of-park alarm. Based on your explanation of that that only comes into play in terms of the feasibility, that too was not a basis for Judge Polk's ruling on summary judgment. So would you agree that that issue also really doesn't bear on the correctness of the summary judgment ruling? Yes, I do agree. It's only on the causation issue. Yes. All right. Yes, I agree. Definitely. And so maybe I'll jump into that issue since it is obviously the most important issue here. So the district court found that there was an analytical gap between our experts' data and the conclusions that they drew. And I want to explain first why that isn't true based on the testing that they did do and then why that isn't true based on the testing that the district court wanted them to do but they did not do. When you're talking about testing, the district court was obviously very frustrated. And I've got to say I was pretty frustrated too. You stated in document 62-2 that the defendant's motion ignores or omits mention of occasions where the shifter moved into park or reverse of its own accord after some period of time. That is your reply brief in the district court. And then you make reference to another exhibit that simply isn't in the record at all. My there was testing that showed that the shifter without nudging moved into reverse from a false park after more than whatever the number of seconds, eight or nine seconds, minimum necessary to get the victim behind the car. And if so, where is that specific evidence? There is not specific evidence of that precise series of comments. Although, if I could... You could have avoided a lot of frustration at the district court if you had said that. I don't disagree with that for sure. But I think, well, first of all, I do want to emphasize that part of the problem is that when Mr. Meyer was deposed, he was very upfront about how he was not... The focus of his testing was not to analyze the timing of the self-shift from perched into reverse. So he did take videos. He did take notes. There's the video index that has the notes. There's some inspection notes in the record. But he was very clear. I didn't... He says something to the effect that I wasn't really testing that. So he kind of refused to agree or disagree with FCA when they said, can you tell me whether after seven to eight seconds, whatever self-shifted. But I think the point is the testing that he did do was sufficient. So he definitely showed clearly on the record that the shifter could be perched. That's not really disputed. The district court agreed with that. He definitely showed that once it's perched, it can be unperched on its own. Okay. You lost me there. I think he testified, I think it's on page 1028 in volume five, that the only time that when he lifted his hand off of the lever, that it went into reverse was that incident where it lasted four minutes and he had to nudge it. And he said that that took 13 newtons, 14 and a half newtons, and 26 newtons. I think that's something I do want to correct a little bit because I think the issue, certainly the four minute incident, he did say that then he nudged it. But there were a lot of times in the record, and I think the district court sort of hedged on this point, and I want to make it clear here, there were a lot of times in the record where the shifter was perched and it shifted on its own. Immediately, right? I think Mr. Meyer said, I think that's what the FCA says immediately. I thought Mr. Meyer said it, that by the time that, and I could be wrong. You know the case better than I do. But I thought Mr. Meyer specifically acknowledged in his deposition that by the time he took his hand off of the lever, that in those instances when it was seven to eight seconds, when he took his hand off the lever it went into reverse. I think he does say, he says something, I don't, I have it back at my, at the desk there, but I think he says sometimes it was immediate, sometimes it took a while, something to that effect. So it's not particularly clear, I agree, in the record because again he didn't really, he wasn't really noting the time in that way. I guess my point is more, he showed it could be perched. He showed that even quickly, sometimes quickly, perhaps sometimes longer, it can certainly unperch on its own. Well, it's the perhaps sometimes longer that I think is the question here. FCA is, seems to be arguing that the linchpin of the expert's opinion had to be that it was in a false park position for seven to eight seconds. Coming back to Judge Ebell's question, is there anything to show that the testing would support the seven or eight second theory? And I think what we have to point to there is that it was certainly shown that it could be perched and stay perched for longer than seven to eight seconds and we're sort of piecing it together. Also it was shown that certainly when it's perched it can be knocked into unperched on its own. So we're putting those two things together and saying we've showed it can be perched, we've shown it can stay perched for a long time. Let me ask you this then. Let's say you somehow can piece things together along the lines that you're describing. But here we are on appellate review and we're on abuse of discretion. We have the Supreme Court saying in the General Electric case that appellate courts are supposed to defer to district judges on their gatekeeping function under Daubert. So even if your theory is arguable, how can we say that the district judge abused his discretion? I do understand that it's a differential standard. I think here the issue is that the judge was sort of going beyond reviewing the reliability or the methodology that was used and ventured into deciding whether he found it persuasive or not. So I think the point is that the testing that was done might not... So is this coming back to the point you were making in response to my initial question? Is this where you think there was legal error? I think there is legal error in requiring testing where testing is not required. And I think that comes from... Did the district court require testing? Or did the district court say, look, there has been some testing and that testing does not prove your position? I mean, maybe they'd have been better off to do no testing at all. Maybe you would have been better off doing no testing. You're experts. Well, I think he was... Well, I don't think that he necessarily was criticizing the testing that was done as much as knocking the absence of testing that he wanted to see. He wanted to see timing of the shift or self-shifting into reverse. And he wanted to see testing of the forces within a car that could map on to the force measurements that the experts took. So he essentially said, it's fine. I believe you, that you can perch a shifter. I think he credits the fact that there is testimony in the record that it can stay perched for long enough. But then I wanted more information about how it's going to self-shift into reverse. And I think that's where we're saying that there was enough in the record to go to a jury. It doesn't have to be... Well, I didn't mean it. Finish. Oh, it doesn't have to be proven with certainty and it doesn't have to be correct in order to go to a jury. Let me probe that. And I don't want to take up your rebuttal time either, but it seems to be that what the judge is saying is that Mr. Meyer, rightly or wrongly, acknowledged that it either moved instantaneously, which wouldn't account for her being in back of the vehicle at the time because she couldn't have gotten back there, or that it had to self-shift on its own. Mr. Meyer acknowledges that the only time after seven or eight seconds was when he nudged it. And those were the calculations of the 13 to 26 newtons. But he never says, well, what could have caused those 13 to 26 newtons of force? Mr. Sullivan then says, well, it could be the air compressor coming on, it could be small vibrations, etc. But Mr. Sullivan never says that, well, based on my... But he doesn't ever say that, well, if a car door opens, that's roughly five newtons. We're not talking about something that all of us know, like gravity. And so what Judge Polk is saying is, you know, we have an analytical gap. We have that there was a nudging, small forces, 13 to 26 newtons by Meyer. We have Sullivan saying that it could be an air compressor, etc. The gap is between those two things. Is an air compressor more or less than 26 newtons? And what he's saying is, I think is, I don't know. And the jury has no way of knowing. And that is an analytical gap that has to be explained either by virtue of Mr. Sullivan's vast experience or by testing. And you never, even in district court or on appeal, to, I believe, really explain why that gap doesn't exist. Well, I think maybe you hit on our argument, which is the idea that testing is not required. Mr. Sullivan doesn't have to run tests to say that 10 newtons is a very tiny amount of force that's consistent with any number of things that could happen in a vehicle. And I think it is true that that sentence, as I just said it, is not in the report. But it certainly is the implication, if I may continue, it's certainly the implication of what his opinion is. And here, there was no trial. There was the deposition where that particular argument or question was not posed to him. So it's not that he is incapable of answering that question on the basis of his experience. Thank you, counsel. Your time is up. I apologize to you for taking up your rebuttal. It wasn't on purpose, I promise. Good morning. May it please the court. My name is Ryan Boucher. I represent the Defendant Appellee FCA U.S. LLC, formerly known as Chrysler Group. Your Honors, going back to your point, Judge, this court does not need to decide whether plaintiff's two experts, Meyer and Daubert, of their sole product defect theory in this case is a dispositive issue of own appeal. My arguments will therefore focus on two primary reasons why the district judge properly exercised his discretion in concluding that their part to reverse theory in this particular case is inadmissible under Daubert. First and foremost, the experts testing affirmatively disproved their part to reverse theory with respect to the particular model of vehicle at issue. Second, the testing and investigation that NHTSA performed... Wait a minute. Wouldn't that first point be a proper subject for cross-examination and impeachment of conclusion? If that were the... When I am sitting as a district judge, if I have a conflict, I say, well, that's up for the jury. So you're saying the testing disproved the conclusion is not as a Daubert issue at all. That strikes me as something that the jury should decide. It's a reliability speculation issue, Your Honor, under Daubert. And so they show that their theory, their hypothesis is unreliable. That is supported by NHTSA's testing and investigation. No, no, they show that there is no evidence to support it. I mean, they're not saying technically or theoretically it's not credible or possible. They're saying that our tests on the ground prove that your theory simply isn't applicable. That's pretty much for cross-examination. Your Honor, I think it goes back to what was referenced earlier, which is there's an analytical gap. The hypothesis they came up with is that two things can occur. One, the shifter can be perched in between park and reverse. Then the person can exit the vehicle, walk to the next page on its own. And according to Meyer's own logic, their testing showed that that theory was scientifically disputed. So the other theory was that plaintiff left the vehicle in reverse. Well, before you get to that one, sorry to interrupt you, but before you get to that, can you explain that there were things that can be very small exercises of force, the air conditioning coming on, a car door opening, that could have accounted for that very minute level of force, 13 to 26 newtons. Why isn't that enough to satisfy that gap that you and Judge Polk say existed? Number one, when Sullivan, it's undisputed, when he came up with that hypothesis and drafted his report, formulated his opinions, he had not inspected a vehicle, an exemplar or the actual, he had not tested a vehicle. All he had done is take an exemplar shift lever that someone had built for him, and he tested on that. But not even that showed that it could move. So what? Meyer did. And Meyer, he specifically, this is a complementary use of experts. And Meyer did test, did say that when he nudged it, he measured the forces. It was 13, 14 and a half, and 26 newtons. And then Sullivan says, based on what has already been demonstrated by Meyer's testing, I don't have to retest the number of newtons that are reversed. Based on the newtons that had been measured by Meyer, those small things could have accounted for it. The air compressor coming on, etc. So what's wrong with that? Well, Sullivan did not go so far as to explain that either in his report or his deposition. At no point did he say, here are the newtons that this force causes, and so they are therefore sufficient. He didn't measure those at all. He didn't measure them in newtons, but did he cause the nudging of the shifter. He stated in a conclusory fashion that these hypothetical forces, some of which we know... He said these hypotheticals were, he, in his expert opinion, were sufficient force to have satisfied the prior testing by the first expert, Stephen Meyer, didn't he? All he said was that hypothetical forces could possibly engage. Yes, could. Yeah. Therefore, I mean, that to me is a conclusion. These aren't just forces, but they are forces that are big enough to have satisfied the Meyer's conclusion. He did not expressly state that, no, Your Honor. He was just... No, Your Honor, because then Meyer did perform testing, and A, none of those forces were found to be present, and B, even if they were present, none were found to be sufficient, and I'm talking repeated testing. So to give context, Stephen Meyer performed six different rounds of testing on the subject vehicle in California. In September of 2020, Meyer performed a third round of testing on an exemplar that he found at a used car dealership in California. In October of 2020, he performed a fourth round of testing on that same exemplar at his facility. Later that same month, he reported the incident in Oklahoma. He also had his own exemplar of shifter and transmission, and at no point during that years-long multiple rounds of testing were those forces ever found to be present or sufficient to self-engage, and they were very vague in the reports and their affidavits and even Meyer's notes as to whether or not that testing ever showed that, in fact, those forces could self-engage. Sullivan, on his end, finally, after a Daubert motion was filed, but before his deposition, performed his own round of testing on the subject vehicle at Meyer's facility, he also could not cause those forces to self-engage. And so all of that testing showed that Sullivan's hypothesis that opening a door or a vibration could cause self-engagement proved to be false. So if you look at what Meyer said, he said, the first hypothesis, placing in reverse and exiting the vehicle. I That same logic applies to their second hypothesis. They tested their hypothesis multiple times, two different experts, and it showed it was not possible. They could not replicate that. Can I probe that just a little bit? The first hypothesis, you agree, Judge Polk agrees, that that actually was affirmatively disproven, because it would self, because when it, when he would manipulate the shift lever to reverse, it would automatically go in, it would automatically start backing up. She didn't have enough time to get to the rear of the vehicle. The second hypothesis, and the plaintiff argues that there's only two possible explanations, and you haven't, to my knowledge, even today or in your briefs, come up with a third hypothesis. So there's only two. And the second hypothesis is that it could remain perched in the And then you have, you know, Meyer's testimony that, yeah, it only requires minute levels of force. Sullivan's saying these events, and you're right, he doesn't specifically compare it to the number of newtons. But if there's only two possibilities, and we know affirmatively that the first one is like counter gravity, it just valid basis to infer that the second hypothesis is the only one possible. And that's what the plaintiff is trying to show. No, Your Honor. If you look at both Sullivan's report and Meyer's report, they indicate that the Oklahoma Highway Patrol, who investigated this accident, and went to the summary or judgment response, they also acknowledge SCA's own experts performed their testing and agreed with the Oklahoma Highway Patrol. So I don't think that the first hypothesis is impossible. In fact, two separate groups concluded it was. I'm confused about that. When people came to the scene of the accident, did they discover the vehicle in reverse or in neutral, or what? It's unknown. The plaintiff's nephew is the one who went inside the vehicle and found the shifter. I believe, actually, you're right, Ron, it was in reverse, and he moved it. That's all we know. But yes, Your Honor, it was in reverse. But you've never disputed the testimony that when you put it in reverse, and you take your foot off the brake, it immediately starts backing up. As plaintiffs note in their summary judgment response, our experts do dispute that, that it can be, according to our experts, done. Our focus was, look, even believing everything plaintiff's experts say on their second hypothesis, their own testing shows it's not true. And it is that self-engagement that is the linchpin. If you look at 207 to 208 of Sullivan's report, he says, the propensity to self-engage and to power to reverse presents a very dangerous problem hidden from the operator. It's also on 611. And if you look at Meyer, he says the same thing on page 143. He says their theory shares a critical aspect of the NHTSA investigation. Quote, a delay before the vehicle slips into reverse is a dangerous condition. And so that second step, that is why the analytical gap is so important, is that second step. Counsel, let me just maybe approach it a little differently. I'm interested, what if the district court judge had said, well, reports maybe aren't perfect. They could have been stronger. Testing maybe could have been better. But there's enough there. I think I'm going to let them go ahead and testify as experts. Would that have been an abuse of discretion? And if it would be, tell us why. Yes, Your Honor, I think that would definitely be an abuse of discretion because it would be ignoring their own testing and the evidence before the court. But they did say that it could go from reverse to the false start position and that that is a dangerous situation. Why would it be an abuse of discretion to let the jury hear the experts say that? Because that's not relevant, Your Honor, whether it can go immediately. I'm not talking about immediately. I'm on the second hypothesis. Okay. You're saying after a dwell period it can go? After a dwell period. Okay. What they said was, yes, what their testing shows, if there's a manual nudge, then that's what can force it. If somebody's outside the vehicle, like Plaintiff was here, there's zero evidence that that can occur. And Judge Polk even looked at all the testing videos. He notes it in his order. And that's what he took issue with is there's a huge analytical gap. So what you're saying is the judge had no discretion here in making its Daubert ruling? I think he had, under the facts of this particular case, I think the evidence before him, I think would have been an abuse of discretion if he had ruled otherwise. And the NHTSA investigation also supports the same. There were three categories of vehicles, not the vehicle at issue, but the one that Plaintiff contends was comparable in the NHTSA investigation was the post-1998 Jeep Grand Cherokees with the V8 engine, like this one has, and the 45RFE transmission, so the transmission without the rooster comb component. And the NHTSA's conclusions are pasted into Meyer's report. And NHTSA concluded that their testing showed that they were unable to duplicate UPR on those vehicles. So the vehicle that Meyer and Sullivan contend is the most comparable is the vehicle that also NHTSA, in that round of testing, could not duplicate this theory. Your Honor, I see I'm running out of time. In conclusion, given the foregoing, I think that Judge Paulk's well-reasoned and detailed 37-page opinion cannot be described as arbitrary, capricious, whimsical, or manifestly unreasonable. It's Meyer's and Sullivan's application of the park-to-reverse theory in this particular case with this particular model that is unreasonable. And so we respectfully request that Judge Paulk's order excluding that hypothetical speculative theory be affirmed and that summary judgment also be affirmed. Thank you, Your Honor. Thank you, counsel. Well, that will conclude the arguments in this case, which will be submitted. Counsel are excused, and the court will take a brief recess. The court is in recess.